ANDREW NELSON
Assistant Federal Defender
Federal Defenders of Montana
Missoula Branch Office
125 Bank Street, Suite 710
Missoula, Montana 59802
Phone: (406) 721-6749
Fax: (406) 721-7751
Email: andy_nelson@fd.org

Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRAVIS JOHN BRANSON,<br><br>Defendant. | CR 23-55-M-DLC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

TRAVIS JOHN BRANSON, the above-named Defendant, by and through counsel Andrew J. Nelson, Assistant Federal Defender, and the Federal Defenders of Montana, comes before the Court for sentencing on one count of conspiracy, in violation of 18 U.S.C. § 371; two counts unlawful trafficking of bald and golden eagles, in violation of 16 U.S.C. § 668(a); and one count of violating the Lacey Act, as described in 16 U.S.C. §§ 3372(a)(1)-(2) and 3373(d)(1)(B).  The presentence

investigation report (PSR) calculates a Guidelines sentencing range of 37-to-46 months (Total Offense Level 21, Criminal History Category I).  PSR ¶ 93.

Mr. Branson argues in this memorandum for a sentence of probation as reasonable but not greater than necessary.  He objects to the calculation of the Guidelines sentencing range.  Mr. Branson's personal history and characteristics – particularly the absence of criminal history – support his request for a probationary sentence in this case.

## ARGUMENT

### I. PSR objections potentially impacting guideline range

Mr. Branson extended the PSR objection period in order to address a complex loss amount and restitution calculation.  Not only was that effort largely unsuccessful, the guideline sentencing range increased because the government objected to the zero-point offender adjustment that was initially applied in the draft PSR.

Mr. Branson objects to several components of the PSR that impact the guideline calculation.  He objects to the calculation of loss amount and restitution.  The loss amount should not include the value of hawks or any other bird regulated by the Migratory Bird Treaty Act (MBTA).  There is no legal basis to include MBTA birds like hawks in either the loss or restitution calculation.  Mr. Branson objects to removal of the zero-point offender adjustment pursuant to USSG § 4C1.1 and

objects to application of the leader / organizer enhancement pursuant to USSG § 3B1.1(c).

A. **Loss amount and restitution**

The loss amount will drive the offense level and is a function of the number of birds involved in the offense. The number of birds involved in this offense has been overstated since the inception of this prosecution:

> "In total, the defendants killed approximately 3,600 birds, including eagles."

Indictment (Doc. 2.) p.2 at ¶ 3.

> "Simon stated he thinks the defendant's crew had killed over 1,000 birds since they have been hunting."

PSR ¶ 47, statement of Simon Paul during the March 13, 2021 traffic stop that ended the offense conduct.

> "There was a total of 118 eagles taken at a value of $5,000 each … [t]he total number of hawks taken was 107."

PSR ¶ 49.

The indictment's overstatement triggered the public reaction referenced by Mr. Branson in his acceptance letter. *See* PSR ¶ 52. The Saturday Night Live skit prominently referenced the exaggerated 3,600 number. The actual number is much lower. Arriving at that figure was a difficult task and involved the triangulation of disparate sources of information, primarily Facebook Messenger messages and other digital forms of communication obtained from Mr. Branson's phone. Sometimes

those messages contained photo attachments. Many of those messages were dated, going back to 2016. With the exception of the March 13, 2021 traffic stop and search of Mr. Branson's truck, there were no birds or bird feathers "on the table" as in *United States v. Hugs*, 2024 WL 3838116 (8th Cir. 2024)

The government has gotten a lot of mileage out of the conspiracy charge in this case, including the ability to go back from the last act in furtherance on March 13, 2021 to include evidence from 2016 that may have otherwise been time-barred. Even while what Mr. Branson contends is the co-equal partner in the conspiracy, co-defendant Simon Paul, hides in Canada and evades justice. It is notable that Mr. Paul himself went from a 3,600 to 1,000 bird estimate.

Now we are at 118 eagles and 107 hawks.[1] Mr. Branson accepts the 118 eagle figure as within the scope of the offense conduct, argues that there is no legal basis to include hawks for loss or restitution purposes, and disputes the valuation of eagles at $5,000 per bird.

1. <u>The loss amount and restitution figures cannot include hawks or any other Migratory Bird Treaty Act bird</u>.

Mr. Branson continues to assert that there is no legal basis to include hawks in the loss amount and restitution calculation. Hawks are regulated pursuant to the

---

[1] There is some nuance to the 118 number, a distinction between selling feathers and killing birds highlighted in *Hugs* and discussed *infra*. Mr. Branson has admitted to taking two eagles in Counts 8 and 9 and acknowledges that the offense conduct encompasses 118 eagles.

Migratory Bird Treaty Act. *See* PSR ¶ 49.  The indictment contains no reference to hawks nor any other bird regulated by the MBTA.  (Doc. 2.)  Presumably no information regarding hawks or any other MBTA regulated bird was presented to the grand jury.

Mr. Branson has entered a guilty plea to Count I pursuant to 18 U.S.C. § 371.  Section 371 conspiracy, like any other conspiracy, requires an object – the offense contemplated by the conspirators.  18 U.S.C. § 371 ("If … the offense, the commission of which is the object of the conspiracy, …").  The object of a criminal conspiracy must be either a crime or an act to defraud and a conspiracy count may allege multiple objects.  *See, e.g., United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997).  Critically, "[t]he partners in the criminal plan must agree to pursue the *same* criminal objective …" *Salinas v. United States*, 522 U.S. 52, 64 (1997) (emphasis added).

The object of the § 371 conspiracy alleged in Count I is "to illegally kill, transport, and offer for sale, and sell bald and golden eagles, in violation of 16 U.S.C. §§ 668(a) and 3372(a)(1) and 3373(d)(1)(B)."  (Doc. 2 at 3.).  There is no allegation that killing or selling hawks was the object of the conspiracy outlined in Count I.  Mr. Branson and his co-defendant have not been charged with having the same criminal objective with respect to hawks.  Any violation of the MBTA is outside of

the scope of the § 371 conspiracy charged in Count I.  This failure of allegation dooms any attempt to include hawks in the loss and restitution amount.

2. <u>Loss amount and restitution should not be based on a $5,000 per eagle valuation.</u>

Under the Guidelines regime, "loss" means pecuniary harm, a type of harm that "is monetary or that otherwise is readily measurable in money." USSG § 2B1.1, Application Note 3(A)(iii).  "[P]ecuniary harm does not include emotional distress … or other non-economic harm." *Id*.  There has been a strong emotional reaction to this offense, the brunt of which has been borne by Mr. Branson.  Those symbolic and emotional factors that inflame public opinion are non-pecuniary and not properly part of the guideline framework for estimating loss.

Instead, the Sentencing Commission directs that loss should be estimated using the fair market value of the property taken or damaged as a result of the offense.  USSG § 2B1.1, Application Note 3(C)(i).  "Market value, however, shall not be based on measurement of aesthetic loss (so called 'contingent valuation' methods)." USSG § 2Q2.1, Application Note 4.  The Ninth Circuit has held that the term "fair market value" does not invoke a uniform standard but depends on the specific circumstances of each case. *See United States v. Hardy*, 289 F.3d 608, 613-614 (9th Cir. 2002).  Thus, the market value of property is its value in the market in which it was being traded at the time of the offense. *United States v. Stoupis*, 530 F.3d 82, 85-86 (1st Cir. 2008); *United States v. Lige*, 635 F.3d 668, 671 (5th Cir.

2011) ("the fair market value of stolen goods should reflect the market in which the victim merchant would have sold them"); *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005) ("The standard test for determining fair market value is to look at 'the price a willing buyer would pay a willing seller at the time and place the property was stolen.'" quoting *United States v. Warshawsky*, 20 F.3d 204, 213 (6th Cir. 1994)); *United States v. Wasz*, 450 F.3d 720, 727-728 (7th Cir. 2006); *United States v. Williams*, 50 F.3d 863, 864 (10th Cir. 1995); *United States v. Machado*, 333 F.3d 1225 (11th Cir. 2003).

The Eighth Circuit recently endorsed the market value approach in calculating the value of eagles. *United States v. Hugs*, 2024 WL 3838116 (8th Cir. 2024). The defendant in *Hugs* was convicted on three counts of selling eagle parts pursuant to 16 U.S.C. § 668(a). The district court ordered $70,000 in restitution to account for 14 eagles valued at $5,000 each. Hugs argued that restitution should be limited to $1,600 based on the amount the government spent to purchase eagle parts from Hugs through an informant. The Eighth Circuit agreed and held that "the actual loss caused by his conviction is limited to the money that the government spent to buy the eagle parts." *Hugs* at *2.

There are some distinctions: Mr. Branson has acknowledged taking two eagles in Counts 8 and 9, not just selling eagle parts. But there is an added dimension here. The issue in *Hugs* was restitution, not loss amount. Loss amount implicates Mr.

Branson's liberty interest. Because criminal defendants enjoy a due process right to have the Guidelines calculated correctly, the loss amount calculation has a constitutional backdrop that is absent in the context of restitution. *See Rosales-Mireles v. United States*, 585 U.S. 129, 132-133 (2018) (noting that Guidelines calculation is central to uniformity and fairness in sentencing: "Of course, to consult the applicable Guidelines range, a district court must first determine what that range is.").

The record in this case contains market value information that is sufficient to calculate loss. The government's Offer of Proof (Doc. 25.) references a purchaser paying $650 via PayPal for what appears to be two sets of golden eagle tail feathers in March of 2021. (Doc. 25 at 5.). In addition to tails, wing sets were sold as part of the offense. In 2018, Mr. Branson's co-defendant estimated the value of eagle wings at $150 to $600 per set.

Given this market-based information, valuation of eagles at $1,000 per eagle is not unreasonable. For 118 eagles, loss amount and restitution would be $118,000. Pursuant to USSG § 2B1.1(b)(1)(E), the offense level would be increased by eight levels. *See* PSR ¶ 57.

B.   **The zero-point adjustment**

The final PSR removed the USSG § 4C1.1 zero-point offender adjustment because Mr. Branson possessed a firearm "in connection with" the offense ((a)(7)) and received a Chapter Three role adjustment ((a)(10)).  *See* PSR Addendum.

Mr. Branson should receive the two-level decrease for being a zero-point offender.  Mr. Branson did not possess a firearm "in connection with" the offense for purposes of USSG § 4C1.1.  The zero-point offender adjustment is relatively new but cases interpreting the "in connection with" phrase in the safety valve context are instructive.  The Tenth Circuit has compared § 2D1.1(b) to USSG § 5C1.2(2), which mirrors 18 U.S.C. § 3553(f)(2).  *United States v. Zavalza-Rodriguez*, 379 F.3d 1182 (10th Cir. 2004).  The 10th Circuit framed the test for § 2D1.1(b)(1), which requires mere possession, as a spatial and temporal test with the burden on the government.  In contrast, the safety valve provision of § 5C1.2 (and § 2D1.1(b)(18)) requires analysis of whether the weapon was possessed "in connection with the offense."  That phrase is neither defined by statute nor the correlating guideline.  *United States v. Tanner*, 389 F.Supp.3d 684 (N.D. Cal. 2019).  The defendant must show by a preponderance of the evidence that the firearm lacked a connection to the offense.  The *Zavalza-Rodriguez* court ultimately applied the safety valve adjustment and noted that the "scope of activity covered by 2D1.1 is broader than the scope of activity covered by 5C1.2."  *Zavalza-Rodriguez*, 379 F.3d at 1188; *see also United*

States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) ("to invoke the 'safety valve' in § 2D1.1(b)(18) the defendant has a lower burden, and must only show by a preponderance that a dangerous weapon was not used in connection with the crime."); *United States v. Ferryman*, 444 F.3d 1183 (9th Cir. 2006); *United States v. Garibay*, 2020 U.S. Dist. LEXIS 204629 (fact declaration by defendant secured safety valve despite enhancement for possession).

Here, firearms were not possessed in connection with the conspiracy and Lacey Act offenses in counts 1 and 15. Any possession of firearms was incidental to the taking, possession, sale, transport, or export of golden and bald eagles, a Class A misdemeanor, as alleged in counts 8 and 9. Mr. Branson has no criminal history and represents precisely the type of defendant for whom the two-level decrease was designed.

C. **The aggravating role adjustment**

The PSR removed the USSG § 4C1.1 zero-point offender adjustment in part because Mr. Branson received a Chapter Three role adjustment ((a)(10)). PSR Addendum. The inclusion of an aggravating role adjustment pursuant to USSG § 3B1.1(c) is also the basis for a stand alone objection to PSR ¶ 59.

Mr. Branson contends that he and Mr. Paul are equally culpable, a contention that receives significant support from the recitation of overt acts charged in the indictment. *See* PSR ¶ 2. While Mr. Branson may have taken a more active role

with respect to marketing and selling eagle feathers, Mr. Paul lived in Montana during the course of the conspiracy and was an active shooter the entire time.  Mr. Paul also shipped the bald and golden eagle parts to end line purchasers.  Mr. Branson traveled to Montana periodically but Mr. Paul was here continuously and was actively taking birds for several years.  Mr. Paul was identified as the co-conspirator who trafficked eagle feathers in Canada.  PSR ¶ 20.  There is no indication that Mr. Paul received less than fair market value for birds he shot.  The unidentified "crew" referenced in the PSR may have been engaged in similar conduct but the conspiracy here was limited to Mr. Paul and Mr. Branson.  The rationale in the PSR – that "everything went through" Mr. Branson – comes from Simon Paul in 2018, years before the end of the criminal enterprise.  *See* PSR ¶¶ 31, 59.

      The government bears the burden of showing Mr. Branson should receive an aggravating role increase.  *United States v. Al-Rikabi*, 606 F.3d 11 (1st Cir. 2010); *United States v. Milton*, 153 F.3d 891 (8th Cir. 1998).  As noted in the Background commentary to USSG § 3B1.1, in smaller criminal enterprises the "distinction between organization and leadership, and that of management or supervision, is of less significance …" than in larger enterprises.  The two charged co-defendants were coequal partners in this very small scale criminal conspiracy.   The enhancement is simply not warranted.

## II.  The 18 U.S.C. § 3553(a) sentencing factors

Travis John Branson is a 49 year-old father of five.  PSR ¶¶75-76.  He grew up in St. Ignatius, Montana and lived in Polson, Pablo, and Ronan.  PSR ¶ 74.  He now lives with his family in Cusick Lake, Washington.  *Id*.  Mr. Branson cares for his son, who suffered a traumatic brain injury in 2021 and is confined to a wheelchair, in the family home.  PSR ¶ 52.

Mr. Branson graduated from Two Eagle School in Pablo in 1994.  PSR ¶ 84.  He attended one year of college at the Salish Kootenai Community College.  PSR ¶ 85.  He has a good employment history and until recently worked for many years for the Kalispell Tribe as a maintenance supervisor.  PSR ¶ 87.  Mr. Branson lost his job due to the current offense.  *Id.*

Mr. Branson abuses neither drugs nor alcohol.  PSR ¶¶ 80-83.

Mr. Branson suffered an acute stroke in April after he had changed his plea in March, probably due in part to stress related to his current legal situation and hypertension.  PSR ¶ 78; see also medical records filed under seal as Exhibit A (17 selected pages).  He also suffers from anxiety and depression.  PSR ¶ 79.

Mr. Branson has no scorable criminal history.  PSR ¶¶ 66-72.  He has accepted responsibility for these offenses and will have to work hard to shoulder family obligations and a significant restitution obligation.  The Ninth Circuit Court of Appeals has observed that "the district court's goal of obtaining restitution" pursuant

to 18 U.S.C. § 3553(a)(7) is "better served by a non-incarcerated and employed defendant." *United States v. Rangel*, 697 F.3d 795, 803-04 (9th Cir. 2012) (*quoting United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (*en banc*)).

## REQUEST FOR SENTENCE

For all of these reasons, Travis John Branson respectfully requests a statutory variance to sentence of probation.

RESPECTFULLY SUBMITTED this 3rd day of September, 2024.

TRAVIS JOHN BRANSON

/s/ Andrew Nelson
ANDREW NELSON
Assistant Federal Defender
Federal Defenders of Montana
         Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024 a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| __1, 2__ | CM-ECF |
| _____ | Hand Delivery |
| __3__ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1. CLERK, UNITED STATES DISTRICT COURT

2. RYAN G. WELDON
   RANDY TANNER
   Assistant U.S. Attorneys
       Counsel for the United States of America

3. TRAVIS JOHN BRANSON
       Defendant

By:   /s/ Andrew Nelson
      ANDREW NELSON
      Assistant Federal Defender
      Federal Defenders of Montana
          Counsel for Defendant
