**RYAN G. WELDON**
**RANDY J. TANNER**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**P.O. Box 8329**
**Missoula, MT 59807**
**101 E. Front, Suite 401**
**Missoula, MT  59802**
**Phone:  (406) 542-8851**
**FAX:  (406) 542-1476**
**E-mail:      Ryan.Weldon@usdoj.gov**
              **Randy.Tanner@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23-55-M-DLC** |
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM** |
| **TRAVIS JOHN BRANSON,** | |
| Defendant. | |

1

## INTRODUCTION

The bald eagle has many meanings in folklore, which is a testament to the importance of the eagle to America's soul.  The United States relied on this symbol as a battle cry during the formation and infancy of this very republic.  When the eagle was on the brink of extinction, everyone joined forces to resurrect the eagle populations for future generations to enjoy.  Indeed, "[t]he recovery of the bald eagle is one of the most well-known conservation success stories of all time." United States Fish & Wildlife, *Bald Eagle*, available at https://www.fws.gov/species/bald-eagle-haliaeetus-leucocephalus (last accessed September 2, 2024).

But not everyone seeks to preserve the eagle population.  Defendant Travis John Branson, for example, sought to profit by shooting, killing, and selling eagles—for years.  Branson did this despite knowing full well that his actions were wrong.  When negotiating purchase prices of eagle feathers with a potential buyer, Branson repeatedly acknowledged his conduct was criminal:



He told another potential buyer he would obtain other eagle tails by "go[ing] on a killing spree."



Branson pleaded guilty to one count of Conspiracy, in violation of 18 U.S.C. § 371, two counts of Unlawful Trafficking of Bald and Golden Eagles, in violation of 16 U.S.C. § 668(a), and one count of a Lacey Act Violation, in violation of 16 U.S.C. §§ 3372(a)(1), (a)(2), and 3373(d)(1)(B).  PSR ¶¶ 3-12.  Branson has a criminal history category of I, and a guideline range of 37 to 46 months of imprisonment.  PSR ¶ 93.

The defense lodged eight objections.  Addendum, PSR, p. 2-4.  Six of the objections (Objections 3-8) are factual, and Branson's comments were added to the PSR.  Given the inclusion of Branson's statements in the PSR, the United States does not believe a ruling from the Court is necessary for Objections 3-8.  *See* Fed. R. Crim. P. 32(i)(3)(B) ("At sentencing, the court . . . must—for any disputed

portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary . . . .").

Two of Branson's objections require resolution, which are the loss amount and restitution. Addendum, PSR, p. 2-3. The objections should be denied, and Branson should receive a significant sentence of imprisonment.

## ARGUMENT

**Sentencing Analysis:**

Section 3553(a) of Title 18 of the United States Code contains prefatory language —"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Those purposes include the need for the sentence to:

- reflect the seriousness of the offense;

- promote respect for the law;

- provide just punishment for the offense;

- afford adequate deterrence to criminal conduct;

- protect the public from further crimes of the defendant; and,

- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In addition, subsection (1) of § 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the

defendant; subsection (3) requires the Court to consider the kinds of sentences available; subsections (4), (5), and (6) require the Court to consider the sentencing guidelines and policy statements, and to avoid unwarranted sentencing disparity; and subsection (7) requires the Court to provide restitution to victims.

**Loss Amount and Restitution**

Branson argues the loss amount should not include the killing of hawks, and he disputes the values of $5,000 per eagle and $1,750 per hawk. Addendum p. 2, PSR. Branson then argues restitution is not allowable under the Mandatory Victim Restitution Act. Addendum, p. 3, PSR. He is wrong.

Branson's killing of hawks is relevant conduct, meaning it is included in the fraud loss. While it is certainly difficult to value eagles and hawks, the United States is only proposing that the Court re-impose the same value it has used in a prior case. *See, e.g., United States v. Hugs*, 2012 WL 12896397, p. 2 (D. Mont. July 12, 2012), *affirmed by United States v. Hugs*, 507 Fed. Appx. 738 (9th Cir. 2013) (unpublished).

The investigation for this case has definitively proven that Branson and his co-conspirators killed 118 eagles and 107 hawks. Each of these killings is documented in Branson's own text messages. The United States will pursue these numbers for loss and restitution as outlined below, but the full scope of the conspiracy is likely much larger and requires further explanation:

- First, the investigation proved every killing identified above by referencing Branson's text messages. The United States will introduce these messages at sentencing. The investigation, however, was unable to recover approximately two years of Branson's text messages during the commission of the conspiracy. This means the full scope of Branson's killings is not captured given the two-year gap in text messages.

- Second, Branson did not scrupulously document every killing by text message, meaning there are undoubtedly instances where Branson shot and killed eagles, but the killings were not documented and counted for loss and restitution.

The above explanation of the numbers matters because when interviewed, Simon Paul told law enforcement that they killed approximately 3,600 birds during the time of the conspiracy. PSR ¶ 31. While that number is not pursued for loss and restitution, it is certainly relevant under the 3553(a) factors.

When evaluating fraud loss and restitution, the United States must prove the amounts by a preponderance of the evidence. *See, e.g., United States v. Lucas*, 101 F.4th 1158, 1162-1163 (9th Cir. 2024); *United States v. Waknine*, 543 F.3d 546, 558 (9th Cir. 2008).

Starting first with the fraud loss, such loss includes all relevant conduct, including Branson's killing of the hawks. Relevant conduct consists of "all acts and omissions" and "jointly undertaken criminal activity." USSG §1B1.3(a)(1)(A), (B). In the case of jointly undertaken criminal activity, it includes any enterprise "whether or not charged as a conspiracy" that is "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal

6

activity," and "reasonably foreseeable in connection with that criminal activity." USSG §1B1.3(a)(1)(B)(i)-(iii).

Branson was engaged in the killing of birds for profit. (Doc. 2 at 2). Indeed, "the defendants killed 3,600 birds, including eagles." (Doc. 2 at 2). The killing of the hawks and eagles, "whether or not charged as a conspiracy" was within the scope of the agreement between Paul and Branson, it furthered their enterprise, and it was foreseeable because they continued to work together when killing the birds.[1] The hawks are therefore included in the loss calculation.

After defining what can be included, the next issue is the value of the wildlife. To make such a determination, the guidelines specifically direct courts to analyze the "market value" of the illegally taken wildlife. USSG §2Q2.1(b)(3)(A).

> When information is reasonably available, "market value" . . . shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (*e.g.*, taxidermy) cost. Market value, however, shall not be based on measurement of aesthetic loss (so called "contingent valuation" methods).

USSG §2Q2.1, n. 4. A district court must first attempt to find the "fair-market retail price" of an animal. *United States v. Rodebaugh*, 798 F.3d 1281, 1298-1299

---

[1] As a practical matter, if Branson is indeed correct that the hawks are not included here, he could be subjecting himself to further criminal prosecution under the Migratory Bird Treaty Act. *See, e.g., United States v. Crooked Arm*, 853 F.3d 1065, 1066 (9th Cir. 2017).

(10th Cir. 2015). If such a fair-market value is difficult to ascertain, a court can instead make a reasonable estimate of the price using reliable information. *United States v. Levine*, 743 Fed. Appx. 154, 155 (9th Cir. 2018) (unpublished).

Here, the fair-market retail price of eagles and hawks is difficult to ascertain because such sales are inherently illegal. *See, e.g.*, 16 U.S.C. § 668. As a result, there can be no open market and no objective standard against which to assess the sales in this case. Additionally, the sales price of an eagle part on the black market does not account for the shooting of the entire bird by Branson and his cohorts.[2]

Given these uncertainties, other valuation methods can help determine the value under §2Q2.1(b)(3)(A). This includes the replacement costs of the eagles and raptors. The District of Montana has previously found that $5,000 per eagle and $1,750 per hawk were an appropriate replacement cost. *United States v. Hugs*, 2012 WL 12896397, p. 2 (D. Mont. July 12, 2012), *affirmed by United States v. Hugs*, 507 Fed. Appx. 738 (9th Cir. 2013) (unpublished); *see also United States v. Ross*, 2012 WL 4848876, p. 4-5 (D.S.D. 2012) (finding hawks valued at $1,750.00). While dramatic and unsupported requests for increased replacement

---

[2] The Eighth Circuit recently addressed the selling of eagle parts. *United States v. Hugs*, ___ F.4th ___, 2024 WL 3838116, p. 2 (8th Cir. Aug. 16, 2024) (convicted of *selling* eagle feathers—not *taking* eagles—and restitution only totaled what informant paid for the *sale* of the feathers, which was $1,600.00). Here, Branson actually killed eagles, making the analysis for the sale of the eagle feathers in *Hugs* informative but inapplicable in Branson's case.

costs can result in error, *United States v. Bertucci*, 794 F.3d 925, 929 (8th Cir. 2015), the United States' request remains the same (even despite the likely inflation of these costs over the past 12 years).  Further, at the sentencing hearing, the United States will present agent testimony to again establish the values of the eagles and hawks.

As to restitution, the Mandatory Victim Restitution Act makes restitution mandatory for any offense against property under Title 18 in which an identifiable victim has suffered a physical injury or pecuniary loss.  18 U.S.C. § 3663A(c)(1).  Conspiracies to violate the Lacey Act qualify as offenses against property for purposes of the Mandatory Victim Restitution Act.  *See, e.g, United States v. Butler*, 694 F.3d 1177, 1183 (10th Cir. 2012); *United States v. Bengis*, 631 F.3d 33, 40-41 (2d Cir. 2011); *United States v. Oceanpro Industries, Ltd.*, 674 F.3d 323, 331 (4th Cir. 2012); *cf. United States v. Hugs*, ___ F.4th ___, ___, 2024 WL 3838116, p. 1-2 (8th Cir. 2024) (explaining Bald and Golden Eagle Act does not authorize restitution under the MVRA but instead as a special condition of supervised release).  As a result, full restitution must be awarded under the statute.

Additionally, the defendant agreed to pay full restitution in the plea agreement:

> The defendant also agrees to be responsible for *complete restitution* regardless of whether a count or counts of the indictment have been dismissed as part of this plea agreement.  18 U.S.C. § 3663(a)(3).

9

(Doc. 24 at 3) (emphasis added).  Nothing more is required.  *See, e.g.,* 18 U.S.C. § 3663(a)(3); *see also In re Doe*, 57 F.4th 667, 676-677 (9th Cir. 2023).

**Recommendation:**

Branson and his "crew" killed eagles and then sold them across the country for profit on the black market.  PSR ¶¶ 20, 47.  As a result, Branson is estimated to have made somewhere between $180,000 and $360,000.  *See* PSR ¶ 31 (beginning in 2009 until 2021 and making $15,000 to $30,000 per year).

During a review of Branson's phone, agents recovered multiple photographs of Branson sending feathers and parts from eagles he recently killed.





It was not uncommon for Branson to take upwards of nine eagles at a time. For example, the picture below shows the nine sets of feathers (with one set stacked on top of another set in the upper left corner).



Law enforcement even recovered text messages between Branson and Simon Paul[3] when Branson stated he was specifically looking to shoot a baby eagle.

---

[3] Simon Paul has not yet appeared, and he remains at large. The investigation thus far shows that Paul is not currently in the United States.

11



Not only did Branson kill eagles, but he hacked them into pieces to sell for future profits. Below are two butchered golden eagle claws recovered from Branson's truck after a recent eagle kill. *See, e.g.* PSR ¶ 46.



Branson's crimes occurred over an extended timeframe, and his text messages showed zero remorse for killing eagles. Some messages, which the United States will introduce at sentencing, even show Branson enjoyed and bragged about the number of eagles he killed.

Significant imprisonment will not only serve as a deterrent to Branson, but as a warning to all others watching and engaging in similar conduct. *See, e.g., United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (discussing general deterrence).

Here, Branson was an enthusiastic participant in the slaying of hundreds—and likely thousands—of protected birds, including eagles and hawks. Branson's killings are an afront to one of our nation's most prized symbols, and his sentence should reflect the seriousness of those offenses.

DATED this 3rd day of September, 2024.

JESSE A. LASLOVICH
United States Attorney


*/s/  Ryan G. Weldon*
RYAN G. WELDON
Assistant U.S. Attorney

*/s/  Randy J. Tanner*
RANDY J. TANNER
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached memorandum contains 2,294 words, excluding the caption and certificate of compliance.

                JESSE A. LASLOVICH
                United States Attorney

                */s/ Ryan G. Weldon*
                RYAN G. WELDON
                Assistant U.S. Attorney

                */s/ Randy J. Tanner*
                RANDY J. TANNER
                Assistant U.S. Attorney